# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN ALEXANDER SNYDER,     )
       Petitioner,     )     **Civil Action No. 12-220 Erie**
       )
       v.     )     **District Judge Nora Barry Fischer**
       )     **Magistrate Judge Susan Paradise Baxter**
**DISTRICT ATTORNEY OF WARREN**     )
**COUNTY, et al.,**     )
       Respondents.     )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

It is respectfully recommended that the petition for a writ of habeas corpus filed by Petitioner, John Alexander Snyder, be denied and that a certificate of appealability be denied.

## II.    REPORT[1]

### A.    Relevant Background

In 2008, Petitioner was charged in the Court of Common Pleas of Warren County with committing numerous sexual offenses against his daughter Jessica. Her mother, Jennifer Snyder, was married to Petitioner but they were separated and did not live together. Jury selection in that criminal case was scheduled for April 6, 2009.[2] In the early morning hours of April 5, 2009, Jessica was at her mother's home, which is located at 1108 Madison Avenue in Warren, Pennsylvania. She and her maternal grandmother, Lucille Woods, were awake at around 1:35 a.m. and on the first floor of the

---

[1] Respondents have submitted hard copies of the relevant state court records. The records are contained in two volumes and the pages are numbered. All documents cited herein are contained in those two volumes and shall be cited to by their page number as follows: "SCR at ___."

[2] That case was docketed in the Court of Common Pleas at Criminal Docket No. CP-62-CR-293-2008. Petitioner eventually pleaded *nolo conendere* to one count of Indecent Assault of Person Less than 13 years of Age. On November 23, 2009, the court sentenced him to a term of 12-36 months' imprisonment.

home when they heard someone smashing out the windows of Jennifer's van, which was parked in the driveway of the home. Jessica called 911 and told the dispatcher that Petitioner was the vandal. Lucille also spoke to the dispatcher.

Officer Paul Reinken responded to the scene and observed that three of the windows in Jennifer's van had been destroyed. He interviewed Jessica and Lucille. Afterwards, Petitioner was charged with one count of Criminal Mischief for vandalizing the van, and one count of Retaliation Against a Witness (Jessica was scheduled to testify against him at his upcoming criminal trial). Those two charges were filed at Criminal Docket No. CP-62-199-2009 in the Court of Common Pleas of Warren County.

Petitioner's trial was held on March 19, 2010. The Honorable Maureen Skerda presided. Public Defender John Parroccini, Esq., represented Petitioner. Jessica Snyder and Lucille Woods were two of the prosecution's witnesses. Jessica testified on direct review that as soon as the incident happened her grandmother screamed to her "it's John [Petitioner]. Call 911." (SCR at 321). She said that when she looked out the front door she "saw John running, like away from the house and, like, towards his car. That [sic] was parked directly under the street light." (SCR at 327). The prosecutor asked Jessica how she knew it was Petitioner's car, and she replied: "Because, him and my mom bought it, I don't remember how long it was, before he moved out. But, I knew what the car was. And, it was parked outside of our house like every day when he still lived there." (SCR at 328). Jessica also testified that Petitioner "yelled at me and screamed[,]" and that she got a good look at his face. She stated that there was no question at all that the vandal was Petitioner. (SCR at 328-29).

Attorney Parroccini attempted to show during his cross-examination of Jessica that she merely assumed that the vandal was Petitioner. Jessica acknowledged that as soon as she heard the commotion outside she immediately suspected that he was responsible. (SCR at 332, 338). Her suspicion was confirmed, she stated, when "[h]e yelled that he was going to kill me[,]" and "looked right up at the

2

porch where my grandma was." (SCR at 334). Parroccini then asked Jessica about testimony that she had given at a hearing that took place a few days after the incident on April 9, 2009. He pointed out that although she now was indicating she observed Petitioner from the front, during that hearing she had stated that she saw him from the side and as his back was turned towards her. Jessica clarified that she saw "[t]he side of his face." (SCR at 335). On redirect examination, Jessica testified that she was "absolutely certain" that the vandal was Petitioner and that she had become sure of that fact "[w]hen he was running from the van … to his car on Hammond." (SCR at 241).

Lucille Woods testified that as soon as the vandalism started she called to Jessica to dial 911 because Petitioner was smashing out the windows in the van. (SCR at 247). She said that she was absolutely certain that it was Petitioner and that she got a "direct look when he was smashing the back of the window on [Jennifer's] van." (SCR at 351-52). She also said she saw him running from the house to his car. (SCR at 353).

Attorney Parroccini attempted to demonstrate through his cross-examination of Lucille that she was only able to observe the vandal for a few seconds. (SCR at 357-58). He also attempted to point out a purported inconsistent statement she had made at the April 9, 2009, hearing about observing Petitioner from a window in the living room as opposed to a "side" window. Lucille clarified that the "side" window she had referenced was located in the living room. (SCR at 359-60).

Petitioner's fiancé, Deidre Cayre, testified for the defense. She stated that she was with Petitioner at the time of the incident. They were at his mother Connie Snyder's home. Connie lived on Pioneer Avenue, which is located not far from Jennifer's home on Madison Avenue. Deidre stated that Petitioner left Connie's home at about 1:15 a.m. to drop his daughter Natasha off at her mother's home on Buchanan Street, which is located three blocks away. Deidre testified that he returned to his mother's

home on Pioneer Street a few minutes later. She stated that she and Petitioner were having sexual intercourse at around the time the vandalism occurred at Jennifer's home. (SCR at 377-78, 382-83).

Petitioner's mother, Connie Snyder, also testified for the defense. Her testimony was inconsistent with Deidre's. She stated that Petitioner left to take Natasha home at 12:15 a.m. and that he came home "just a few minutes later." (SCR at 367). On cross-examination, she admitted that at the April 9, 2009, hearing she testified that Petitioner had left her house at around 1:20 a.m. (SCR at 370).

Petitioner's other daughter, Natasha Snyder, testified that Petitioner took her home around 1:15 a.m. the morning of April 5, 2009. (SCR at 393). On cross examination, she acknowledged that Petitioner drove her in his red car. (SCR at 398). She also stated that he was drinking a beer. (SCR at 399).

Finally, Officer Reinken testified that he drove the route the prosecution was claiming Petitioner took the morning of the incident (from Connie's home, to Natasha's home, to Jennifer's home, and then back to Connie's home). He stated that he did it twice around 2:00 a.m. and that it took him just over nine minutes once, and just over ten minutes the other time. (SCF at 403-08). Thus, if Petitioner did leave Connie's home at around 1:15 a.m. (as both Deidre and Natasha stated), he would have had time to drop Natasha off and then be at Jennifer's home at the time the vandalism occurred.

The jury found Petitioner guilty of both crimes. The trial court imposed monetary penalties for the crime of Criminal Mischief. For the crime of Retaliation Against a Witness or Victim, the court sentenced Petitioner to a term of imprisonment of 11 months to 2 years, to be served consecutive to a sentence he was serving for his conviction in the other criminal case (the 12-36 months' imprisonment he received on his conviction of Indecent Assault of Person Less than 13 years of Age (see footnote 2)). (SCR at 144).

Petitioner, who was dissatisfied with Attorney Parroccini's representation, did not pursue a direct appeal. Instead, he immediately filed a *pro se* motion under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* (SCR at 138-43). He claimed that Parroccini provided him with ineffective assistance for failing to call three witnesses for the defense: his father, an unidentified State Trooper, and another unidentified individual. These witnesses, Petitioner contended, would have proved his innocence.

The PCRA court (Judge Skerda) appointed Nicole Sloane, Esq., to represent Petitioner in the PCRA proceeding. On September 13, 2010, Petitioner, through Sloane, filed a counseled PCRA motion and raised the following three claims of ineffective assistance of trial counsel:

**PCRA Claim 1**:     Attorney Parroccini failed to present evidence pertaining to the statements made during the 911 call. Attorney Parroccini's failure to point out discrepancies between the 911 tape, in which Lucille [Wood] admitted she could not see the vandal, and trial testimony, in which Lucille said she observed Petitioner, was not designed to effectuate the Petitioner's interests. Counsel's unreasonable performance prejudiced Petitioner because the jury did not have the opportunity learn that the witnesses merely believed that the assailant must be Petitioner and did not actually see the assailant at the time the vandalism took place. Further, had Attorney Parroccini properly impeached Lucille's testimony on this point, the jury would have likely questioned the veracity of all of Lucille's testimony.

**PCRA Claim 2**:     Attorney Parroccini failed to subpoena a Pennsylvania State Police trooper who could have testified about the vandalism in the neighborhood where the victim's vehicle was vandalized. Attorney Parroccini knew about the other acts of vandalism, knew that the State Police had information pertaining to the vandalism, and failed to subpoena both the trooper and the evidence. Attorney Parroccini's failure to call the trooper was not designed to effectuate Petitioner's interests. Counsel's unreasonable performance prejudiced Petitioner by denying the jury from hearing about an alternative theory behind the vandalism that did not include Petitioner.

**PCRA Claim 3**:     Attorney Parroccini failed to object when the prosecutor elicited testimony by the investigating officer that as a result of the alleged vandalism, the officer "filed for violation of protection from abuse order." Further, Attorney Parroccini pointed out that at a previous "*revocation hearing*," Jessica testified she observed Petitioner from the back. Attorney Parroccini had no reasonable basis for not objecting to the references to prior crimes and bad acts. Allowing such references were not designed to effectuate Petitioner's interests. Counsel's unreasonable performance prejudiced Petitioner because

evidence that the defendant engaged in other criminal behavior before the instant offense made the jury more likely to believe Petitioner committed the crimes charged. Additionally, Attorney Parroccini had no reasonable basis for failing to ask for a cautionary instruction.

(SCR at 192-93 (emphasis in original)).

The PCRA court scheduled an evidentiary hearing on Petitioner's claims. Prior to that proceeding, Petitioner subpoenaed Trooper Gross of the Pennsylvania State Police to testify in support of Claim 2. The Commonwealth filed a motion to quash (SCR at 77) and on October 5, 2010, the PCRA court presided over an in-chambers hearing in which Trooper Gross testified that he had no knowledge regarding vandalisms that might be relevant to Petitioner's case. (SCR at 476). On that same date, the PCRA court issued an order that the subpoena be quashed. (SCR at 213).

The PCRA hearing was held on October 15, 2010. Petitioner and Attorney Parroccini testified. On October 29, 2010, the PCRA court issued a Memorandum Opinion in which it denied each of Petitioner's claims on the merits. (SCR at 216-23).

Petitioner, through Attorney Sloane, filed an appeal with the Superior Court of Pennsylvania. In that appeal, Petitioner contended that the PCRA court erred in denying Claims 1 and 3. No issue was raised regarding the denial of Claim 2. (SCR at 243-44).

On June 24, 2011, the Superior Court issued a Memorandum in which it affirmed the PCRA court's decision to deny relief. It adopted in full those portions of the PCRA court's Memorandum Opinion in which it addressed Claims 1 and 3 (the only claims raised on appeal). (SCR at 269-72).

On or around August 11, 2011, Petitioner filed a second *pro se* PCRA motion. (SCR at 257-67). He claimed that Attorney Sloane was ineffective as his PCRA counsel for failing to convince the PCRA court that he was prejudiced when the jury heard of his prior bad acts. He also claimed that Sloane was ineffective for failing to raise the claim that Attorney Parroccini was ineffective for not requesting that

the trial court read a cautionary instruction to the jury regarding witness identification in accordance with <u>Commonwealth v. Kloiber</u>, 106 A.2d 820 (Pa. 1954).[3]

On October 18, 2011, the PCRA court notified Petitioner that it was going to deny his second PCRA motion without a hearing because his claims had no merit. It advised him that he had 20 days to show cause why the motion should not be denied. (SCR at 277). Petitioner filed a response in which he argued that the PCRA court should not have considered the merits of the claims he raised in his second PCRA motion. He contended that Attorney Sloane should have withdrawn as his counsel once he notified her that he was dissatisfied with her representation and, therefore, the PCRA court should reinstate his appeal rights *nunc pro tunc* in his first PCRA proceeding. (SCR at 287-90).

On November 29, 2011, the PCRA court issued an Order in which it denied the second PCRA motion. It was not persuaded by the arguments that Petitioner made in his response to its notice of intent to dismiss. (SCR at 293). Petitioner then filed a *pro se* appeal to the Superior Court. In his subsequent Concise Statement of Matters Complained of on Appeal (SCR No. 337-39), he claimed the PCRA court erred in denying his second PCRA motion. He also raised numerous new claims (many of which he raises in his federal habeas petition), but in Pennsylvania a litigant may not raise new claims for the first time on appeal. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Moreover, Petitioner subsequently abandoned that appeal and, on

---

[3] In <u>Kloiber</u>, the Supreme Court of Pennsylvania held:

  where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions . . . the court should warn the jury that the testimony as to identity must be received with caution.

<u>Id.</u> at 826-27 (citations omitted).

December 5, 2012, the Superior Court denied it for failure to file a brief. (SCR, unnumbered second-to-last page).

In September of 2012, approximately three months before the Superior Court issued its order denying Petitioner's appeal, Petitioner filed with this Court his petition for a writ of habeas corpus pursuant to the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court stayed the case pending the completion of Petitioner's appeal before the Superior Court. [ECF No. 2]. On January 9, 2013, the Court lifted the stay. Respondents subsequently filed their Answer [ECF No. 14], to which Petitioner filed a Reply [ECF No. 17].

Petitioner raises seven grounds for relief and numerous subclaims. In **Ground One**, he contends: "actual innocence, miscarriage of justice, denial of due process in violation of U.S. Constitutional Amendments 1, 4, 5, 6, 9, 14." In support of this claim, he alleges that the prosecution committed Brady violations and improperly manipulated the jury during the selection process. (He raises these same claims in more detail in **Ground Three**). Petitioner also complains about his "malicious assignment" to the Cambria County prison and the alleged "failure to provide timely and necessary medical treatment of a dislocated shoulder incurred at Cambria Co. Prison." He further argues that the separation of powers doctrine was violated because the District Attorney "approv[ed] of criminal informations[.]" [ECF No. 1 at 5].[4]

---

[4]     Petitioner also asserts in support of his first claim: "unconstitutional double jeopardy, denial of due process and cruel and unusual punishment[.]" [ECF No. 1 at 5]. These types of conclusory allegations do not state a claim in a federal habeas action. Mayle v. Felix, 545 U.S. 644, 649 (2005) ("Rule 2(c) of the Rules Governing Habeas Corpus Cases requires a more detailed statement [than Rule 8 of the Federal Rules of Civil Procedure]. The habeas rule instructs the petitioner to 'specify all the grounds for relief available to [him]' and to 'state the facts supporting each ground.'"). Id. at 656 (quoting the Advisory Committee's Note on Rule 4 of the Rules Governing Section 2254 Cases and observing: "Notice pleading is not sufficient, for the petition is expected to *state facts that point to a real possibility of constitutional error*."). Petitioner elaborates on some of these allegations in Ground Three.

In **Ground Two**, Petitioner contends that the "Pennsylvania legislature fraudulently abolished the Constitutional requirement of an indicting grand jury and [unintelligible] as to prosecution by criminal informations[,]" and that, as a result, he "was denied due process of law by proceeding in a tribunal without jurisdiction in violation of [his] rights and liberty interests secured by the U.S. Constitution[al] Amendments 1, 5, 6, 9, 14." [ECF No. 1 at 7].

In **Ground Three**, Petitioner repeats many of the grounds for relief that he raised in Ground One and elaborates upon them. He contends the district attorney "was caught 'red handed' tampering with/manipulating petitioner's jury" to exclude males. Petitioner also contends that the prosecution withheld exculpatory evidence of similar acts of vandalism in violation of <u>Brady</u>. He argues that officials in Warren County, the District Attorney, and the Court of Common Pleas "maintain undue control and influence over Public Defender and his assistance and other court appointed counsel[.]" Petitioner further argues that the "District Attorney, knowing that he had been caught in prosecutor misconduct – jury tampering [–] persisted in prosecuting petition in violation of the double jeopardy clause of the Pennsylvania Constitution, Article I, § 10 and U.S. Constitution Due Process and Double Jeopardy Clauses of Amendments 5, 6, 14 thereto." [ECF No. 1 at 9].

In **Ground Four**, Petitioner raises the following claims of ineffective assistance of counsel:

(a)     Public Defender counsels failed to properly investigate petitioner's case and call available witnesses who were ready and willing to testify (including but not limited to petitioner) in petitioner's behalf and defense and/or to cooperate in petitioner's attempts to present a viable defense to the jury.

(b)     Public defender counsel failed to challenge and impeach documented discrepancies in victim-witness statements and 911 transcript conversations, thereby allowing the district attorney to use known perjured testimony to obtain a conviction and prejudice petitioner.

(c)     Public defender counsel failed to object (or request cautionary-corrective jury instruction) as to testimony/offers to the effect exposing petitioner's "prior bad" acts to

the jury which prejudiced petitioner and which likely were deliberately and schematically induced by district attorney through one or more Commonwealth witnesses.

(d)     Public defender counsel failed to demand discovery and [B]rady materials or to effect remedies for Brady violations.

(e)     Public Defender failed to file post conviction motions.

(f)     Public Defender failed to ensure that petitioner would be appointed non-conflicted appeal counsel.

(g)     Public Defender failed to act as sentencing counsel and failed to ensure that Appellant would be given exercise opportunity for allocution.

(h)     Public Defender Chief failed to timely remove ineffective counsel and personality conflict impeding his performance and failed to arrange for court ot [sic] appoint[ed] non-conflict counsel instead of Chief Public Defender.

(i)     Public Defenders failed to timely invoke double jeopardy bars to further prosecution including but not limited to bars from prosecutorial misconduct – Jury Tampering (2x).

(j)     PCRA Counsel failed to investigate petitioner's case and raise, prosecute all meritorious issues in petitioner's case, including but not limited to double jeopardy, [B]rady violations, ineffectiveness.

[ECF No. 1 at 10]. The allegations that Petitioner raises in Grounds 4(b) and (c) are the same as the ones he raised in PCRA Claims 1 and 3. As explained below, those two claims – which he raised in his first counseled PCRA motion and in his subsequent appeal to the Superior Court – are the only claims that Petitioner exhausted in state court.

In **Ground Five**, Petitioner contends that he "was denied due process and subjected to double jeopardy and illegal sentence enhancement in violation [of] U.S. Constitution Amendments 5, 6, 14 to United States Constitution." In support of this claim, he contends that when he was imprisoned at SCI Cresson, he refused to admit his guilt or submit to treatment programs because he was challenging his convictions. He asserts that in retaliation, the Warden caused him to be transferred to the Cambria County Jail, which interfered with his ability to litigate his cases.

10

In **Ground Six**, Petitioner contends that he "was denied a fair and impartial judge and tribunal in violation of Amendments 1, 5, 6, 14 to the United States Constitution" because Judge Skerda was biased against him.

In **Ground Seven**, Petitioner argues that he "was denied due process and a fair trial" because the prosecution knowingly introduced the alleged perjured testimony of Jessica Snyder and/or Lucille Woods.

Respondents have filed their Answer [ECF No. 14], to which Petitioner has filed a Reply [ECF No. 17].

### B.    Discussion

#### (1)    Some of Petitioner's claims are not cognizable in a federal habeas action

One of the complaints that Petitioner makes in Ground One is about his "malicious assignment" to the Cambria County prison and the alleged "failure to provide timely and necessary medical treatment of a dislocated shoulder incurred at Cambria Co. Prison." [ECF No. 1 at 5]. Similarly, he complains about his transfer to the Cambria County Prison in Ground Five. A habeas corpus petition is for challenging the fact of a criminal conviction or the duration of a sentence and its function is to secure release from illegal custody. See, e.g., Preiser v. Rodriguez, 411 U.S. 475, 484-87 (1973). McGee v. Martinez, 627 F.3d 933 (3d Cir. 2010); Leamer v. Fauver, 288 F.3d 532, 540 (3d Cir. 2002). Challenges to "a condition of confinement such that a finding in [Petitioner's] favor would not alter his sentence or undo his conviction[,]" Leamer, 288 F.3d at 542, must be brought in a civil rights action. See generally Brian Means, FEDERAL HABEAS MANUAL § 1:34 (2013), available at Westlaw FEDHABMAN.

Petitioner also contends in Ground One that he is actually innocent. A credible claim of actual innocence can act as a "gateway" through which a federal habeas petitioner may pass to have an

otherwise procedurally barred constitutional claim considered on the merits, <u>see</u> <u>Schlup v. Delo</u>, 513 U.S. 298 (1995), but a stand-alone claim of actual innocence must be denied because it is not cognizable in federal habeas. <u>Albrecht v. Horn</u>, 485 F.3d 103, 121-22 (3d Cir. 2007) (citing <u>Herrera v. Collins</u>, 506 U.S. 390 (1993)). <u>See</u> <u>also</u> FEDERAL HABEAS MANUAL § 1:60. The reason that stand-alone claims of actual innocence are not cognizable in federal habeas was given in <u>Herrera</u>. In that case, the Supreme Court held that federal habeas review is not available "absent an independent constitutional violation occurring in the underlying state criminal proceeding," and that "a claim of 'actual innocence' is not itself a constitutional claim." 506 U.S. at 400, 404. The Court explained that once a defendant is found guilty after a fair trial in the state court, he no longer is entitled to a presumption of innocence, and thus comes before the federal habeas court not as one who is innocent, but as a convicted criminal. <u>Id.</u> at 399-400. Because such a determination in the state criminal trial is "a decisive and portentous event" and "[s]ociety's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the guilt or innocence of one of its citizens," freestanding claims of actual innocence are not reviewable in federal habeas actions. <u>Id.</u> at 401 (internal quotations and citations omitted). The Supreme Court noted that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." <u>Id.</u> at 400. "Federal courts are not forums in which to relitigate state trials." <u>Id.</u> at 401 (quotations and citation omitted). Thus, the Court rejected Herrera's claim that, even if the proceedings that resulted in his conviction and sentence were entirely fair and error free, his innocence would make his execution a constitutionally intolerable event. Based upon the <u>Herrera</u> decision, the Third Circuit Court has emphasized that in non-capital cases such is this case: "It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" <u>Fielder v. Varner</u>, 379 F.3d 113, 122 (3d Cir.

2004) (quoting <u>Herrera</u>, 506 U.S. at 400); <u>Albrecht</u>, 485 F.3d at 121-22. For this reason, Petitioner's stand-alone claim of actual innocence is not cognizable under the federal habeas corpus statute.[5]

In Ground 4(j), Petitioner contends that he is entitled to habeas relief because Attorney Sloane was ineffective during his first PCRA proceeding. This claim is not cognizable as a stand-alone claim and should be dismissed on that basis. Petitioner did not have a federal constitutional right to counsel during his state post-conviction proceeding, <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987), and, therefore, cannot receive habeas relief on a claim that his PCRA counsel was ineffective. 28 U.S.C. § 2254(a) (stating, in relevant part, that habeas relief available only on the grounds that state prisoner is in custody in violation of his constitutional rights); § 2254(i) ("[t]he ineffectiveness of counsel during Federal or State collateral post-conviction proceedings shall not be ground for relief in a proceeding arising under section 2254."). <u>See</u> <u>also</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 752-53 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. <u>Pennsylvania v. Finley</u>, 481 U.S. 551 (1987); <u>Murray v. Giarratano</u>, 492 U.S. 1 (1989) (applying the rule to capital cases). Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. <u>See</u> <u>Wainwright v. Torna</u>, 455 U.S. 586 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance.)").

---

[5]    In <u>Herrera</u>, the Supreme Court left open the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim." 506 U.S. at 417. In <u>House v. Bell</u>, 547 U.S. 518 (2006), the Supreme Court once again left open the question of whether a truly persuasive freestanding innocence claim in a capital case would warrant federal habeas relief if no state avenues of relief remain available. <u>Id.</u> <u>See</u> <u>also</u> <u>McQuiggin v. Perkins</u>, — U.S. — , 133 S.Ct. 1924, 1931 (2013). In <u>District Attorney's Office for the Third Judicial District v. Osborne</u>, 557 U.S. 52 (2009), which was a non-capital case in which a state inmate brought an action under 42 U.S.C. § 1983 to compel the State of Alaska to release biological evidence so that it could be subject to DNA testing, the Supreme Court in dicta assumed without deciding that an actual innocence claim could be brought in habeas, but noted "the high standard any claimant would have to meet" to succeed with such a claim. <u>Id.</u> at 2321 (citing <u>House</u> and <u>Herrera</u>).

Based upon all of the foregoing, the claims discussed above must be denied because they are not cognizable in habeas. (As discussed next, they also can be denied for the alternative reason that Petitioner has procedurally defaulted them).

>    **(2)     All of the claims that Petitioner did not also raise in his appeal to the**
>    **Superior Court during his first PCRA proceeding are procedurally defaulted**

A federal habeas court may not grant a state prisoner's petition for a writ of habeas corpus unless he has first presented his federal constitutional claims to the state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman, 501 U.S. at 731. See also O'Sullivan v. Boerckel, 526 U.S. 838, 842-49 (1999).

> [It is] principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490-491, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973). Under our federal system, the federal and state "courts [are] equally bound to guard and protect rights secured by the Constitution." Ex parte Royall, 117 U.S. [241, 251, 6 S.Ct. 734, 740 (1886)]. Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950). See Duckworth v. Serrano, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights").

Rose v. Lundy, 455 U.S. 509, 517 (1982) (footnote omitted).

Importantly, in order to exhaust a claim, "state prisoners must give the state courts *one full opportunity* to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 844-45 (emphasis added). In

Pennsylvania, this requirement means that a petitioner in a non-capital case *must have presented every federal constitutional claim raised in his habeas petition to the Superior Court either on direct or PCRA appeal*. See, e.g., Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

Respondents contend that the only claims that Petitioner exhausted before the state court are PCRA Claims 1 and 3. Those are the only two claims that he raised in his first PCRA proceeding in his appeal to the Superior Court.

Petitioner carries the burden of proving exhaustion of all available state remedies, see, e.g., Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997), and he has not met that burden. Importantly, in order to do so he must demonstrate that he raised each of the claims at issue to the Superior Court through the proper vehicle, not just that he raised a federal constitutional claim before a state court at some point. See, e.g., O'Sullivan, 526 U.S. at 845 (a petitioner must have presented a claim through the "established" means of presenting a claim in state court at the time); Ellison v. Rogers, 484 F.3d 658, 660-62 (3d Cir. 2007) (the petitioner's claims of ineffective assistance were not exhausted properly even though he had raised those claims on direct review, because state law required that ineffective assistance claims be raised in state post-conviction review, and the petitioner had not sought such review). The record before the Court establishes that the only claims that Petitioner litigated to the Superior Court are the two claims that he raised on appeal in his first PCRA proceeding. Although he may have raised some of the other claims that he raises in the instant petition in the Concise Statement of Matters Complained of on Appeal (SCR No. 337-39) that he filed after the PCRA court denied his second PCRA motion, that is not the proper vehicle for raising for the first time such claims in state court. Moreover, that appeal was denied because he did not file an appellate brief.

In conclusion, the record establishes that Petitioner did not exhaust any of his claims except for the two that he raised on appeal to the Superior Court in his first PCRA proceeding (PCRA Claims 1 and

3). As a result, all of his claims except for those two are procedurally defaulted. See, e.g., Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000); Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). Like the exhaustion doctrine, the doctrine of procedural default is "grounded in concerns of comity and federalism," Coleman, 501 U.S. at 730, and it bars federal habeas review of a claim whenever the petitioner failed to raise it in compliance with a state's procedural rules. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wainwright v. Sykes, 433 U.S. 72 (1977); Lines, 208 F.3d at 162-69.

A petitioner whose habeas claim is procedurally defaulted can overcome the default, thereby allowing federal court review, if he can demonstrate "cause" for the default, i.e., that some objective factor "external to the defense" impeded efforts to comply with the state's procedural rule, and "actual prejudice." See, e.g., Coleman, 501 U.S. at 750; see also Murray v. Carrier, 477 U.S. 478, 488, 494 (1986).

In an attempt to establish "cause" for his default, Petitioner blames Attorney Sloane for not raising his defaulted claims in the first PCRA proceeding. This argument fails. Sloane was charged with exercising her professional judgment in deciding which claims to litigate during the first PCRA proceeding. Although Petitioner now claims she should have raised numerous other claims, as Petitioner's representative her decision not to do so is not the type of conduct that is "external to the defense" that satisfies the "cause" requirement.

The U.S. Supreme Court has recognized that attorney error that is so serious that it amounts to constitutionally ineffective assistance of counsel can constitute cause for relief from procedural default, Coleman, 501 U.S. at 753-54, and Petitioner contends that Sloane's representation amounted to misconduct so severe as to have violated his federal constitutional right to effective representation. This argument does not assist him because, as explained above, Sloane was his PCRA counsel and he did not have a federal constitutional right to counsel during that proceeding. Finley, 481 U.S. at 555.

Of course in <u>Martinez v. Ryan</u>, — U.S. —, 132 S.Ct. 1309 (2012), the Supreme Court held for the first time that in states like Pennsylvania, where state law requires that claims of ineffective assistance of trial counsel be raised in an initial-review collateral proceeding (such as the PCRA), a petitioner may be able to establish "cause" sufficient to overcome a procedural default of "a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective [under the standards of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)]." 132 S.Ct. at 1320.[6] The holding in <u>Martinez</u> does not provide Petitioner with an avenue to establish "cause" for his default, however. First, the holding applies only to ineffective-assistance-of-trial-counsel claims. 132 S.Ct. at 1315-18, 1319 ("<u>Coleman</u> held that an attorney's negligence in a postconviction proceeding does not establish cause, *and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial*.") (emphasis added). Therefore, Petitioner cannot rely on <u>Martinez</u> to overcome the default of any claims except for the ineffective assistance of trial counsel claims that he raises in Grounds 4(a) and (d)-(i).[7] Second, Petitioner cannot rely on any alleged ineffectiveness on Sloane's part to overcome the default of Grounds 4(a) and (d)-(i) because he did not exhaust the claim that Sloane was ineffective in the state court.[8] <u>See</u>, <u>e.g.</u>, <u>Edwards</u>, 529 U.S. at 450-54 (a petitioner can procedurally default the claim of

---

[6]    The Supreme Court based its decision on what it determined to be an equitable right to seek relief from a procedural default in a federal habeas matter. It did not hold that a petitioner has a constitutional right to counsel in initial-review collateral proceedings such as the PCRA. <u>Martinez</u>, 132 S.Ct. at 1313-21.

[7]    As previously explained, Ground 4(j) is not cognizable as a stand-alone habeas claim.

[8]    As set forth above, in his second PCRA motion, which he litigated *pro se*, Petitioner initially contended that Attorney Sloane was ineffective for two reasons: (1) because she failed to convince the PCRA Court that he was prejudiced when the jury heard of his prior bad acts; and, (2) because she failed to raise the claim that Attorney Parroccini was ineffective for not requesting that the trial court give to the jury a <u>Kloiber</u> cautionary instruction regarding witness identification. Petitioner did not fault Sloane for failing to raise any of the many additional claims that he raises in this case. (SCR at 257-67). It was not until the PCRA court denied his second PCRA motion (SCR at 277, 293-94), that Petitioner raised numerous additional claims in his Concise Statement of Matters Complained of on Appeal (SCR at 337-38).

ineffectiveness that he is relying upon to establish cause for the default of another claim). As the

Supreme Court has explained:

> [W]e think that the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," Rose v. Lundy, 455 U.S. 509, 518 (1982), *generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default…*. [I]f a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available. The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court "to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," Darr v. Burford, 339 U.S. 200, 204 (1950), and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.

Carrier, 477 U.S. at 488-89 (emphasis added, parallel citations omitted).

A petitioner may also overcome a procedural default of a claim if he can demonstrate a

"miscarriage of justice." This exception provides that a procedural default may be excused if the

petitioner presents new evidence of "actual innocence" that is "so strong that a court cannot have

confidence in the outcome of the trial unless the court is also satisfied that the trial was free of

nonharmless constitutional error[.]" Schlup v., 513 U.S. 298, 316 (1995). See also House v. Bell, 547

U.S. 518 (2006); Houck v. Stickman, 625 F.3d 88, 93-95 (3d Cir. 2010); Hubbard v. Pinchak, 378 F.3d

333, 339-41 (3d Cir. 2004). It only applies in extraordinary cases where the petitioner demonstrates that

a constitutional violation has probably resulted in the conviction of one who is actually innocent. Id.;

Hubbard, 378 F.3d at 339-40. Although Petitioner insists that he is actually innocent, this simply is not

the type of extraordinary case in which a petitioner can overcome the default of his claims by way of the

miscarriage of justice exception. Petitioner has not come forward with new evidence that shows that "it

is more likely than not that no reasonable juror would have convicted him[.]" Hubbard, 378 F.3d at 340.

Based upon all of the foregoing, all of Petitioner's claims except for Grounds 4(b) & (c) must be denied because they are procedurally defaulted.

### (3) Petitioner is not entitled to habeas relief on Grounds 4(b) and (c)

#### (i) Standard of Review

The only claims that this Court may review are Grounds 4(b) and (c) because those are the only claims that Petitioner exhausted in state court. The PCRA court denied both of those claims on the merits and the Superior Court adopted its reasoning in full. Because the state court adjudicated these claims on the merits, this Court's analysis of each claim is governed by AEDPA's standard of review as codified at § 2254(d). It provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits in State court proceedings* unless the adjudication of the claim–
>
> > (1) resulted in a decision that was *contrary to,[9] or involved an unreasonable application of[10], clearly established Federal law, as determined by the Supreme Court of the United States*; or

---

[9] "The test for § 2254(d)(1)'s 'contrary to' clause is whether the state court decision 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result.' Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams v. Taylor, 529 U.S. 362, 405 (2000), and Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)). Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court's precedent. See Kane v. Garcia Espitia, 546 U.S. 9 (2005)." Rountree v. Balicki, 640 F.3d 530, 537 (3d Cir. 2011) (bracketed text in original) (parallel citations omitted).

[10] "The test for § 2254(d)(1)'s 'unreasonable application of' clause is as follows: '[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case.' Rompilla v. Beard, 545 U.S. 374, 380 (2005) (quoting Wiggins v. Smith, 539 U.S. 510, 519, 520 (2003)). For purposes of § 2254(d)(1), '[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous.' Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Id. at 75-76, 123 S.Ct. 1166 (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)). Rather, '[t]he state court's application of clearly established law must be objectively unreasonable' before a federal court may grant the writ. Andrade, 538 U.S. at 75." Rountree, 640 F.3d at 537 (parallel citations omitted).

> (2) resulted in a decision that was based on an *unreasonable determination of the facts in light of the evidence presented in the State court proceeding.*[11]

(Emphasis added). Review under § 2254(d) is limited to the record that was before the state court.

Cullen v. Pinholster, — U.S. —, 131 S.Ct. 1388, 1398-1401 (2011).

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze Petitioner's ineffective assistance claims are governed by Strickland. Under Strickland, Petitioner must show that Attorney Parroccini's representation fell below an objective standard of reasonableness. 466 U.S. at 688; see also Williams, 529 U.S. at 390-91. The law presumes that Parroccini was effective:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted). The Third Circuit Court has explained that it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) (quoting United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989)).

---

[11] "The test for § 2254(d)(2)'s 'unreasonable determination of facts' clause is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-339 (2006) ('State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' ') (quoting § 2254(e)(1)) (citing Miller-El v. Dretke, 545 U.S. 231, 240 (2005)); see also Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ('Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence.'). Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication. Cullen v. Pinholster, — U.S. — [ ], 131 S.Ct. 1388, 1401-03 (2011)." Rountree, 640 F.3d at 537-38 (parallel citations omitted).

Strickland also requires that Petitioner demonstrate that he was prejudiced by Parroccini's alleged deficient performance. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] proceeding would have been different." Id. at 694. As the Third Circuit Court recently explained:

> [The petitioner] "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case' – rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 693-94). On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Harrington, 131 S.Ct. at 787 (citing Strickland, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial." Id. at 787-88 (citing Strickland, 466 U.S. at 687). *The likelihood of a different result must be substantial, not just conceivable.* Id.

Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011) (emphasis added).

The state court applied the correct legal standard when it evaluated Petitioner's ineffective assistance of counsel claims. (SCR at 217, 271). See also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999) (legal standard for evaluating ineffective assistance claims in a PCRA proceeding is the same as the federal Strickland standard).[12] Therefore, its adjudication of the claims passes federal habeas review under the "contrary to" clause of § 2254(d)(1). See, e.g., Williams, 529 U.S. at 406.

Thus, the only remaining question for this Court with respect to the ineffective assistance claims Petitioner raises in Grounds 4(b) and (c) is whether the state court's adjudication of either of them was an "unreasonable application of" Strickland or an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court has stressed the "highly deferential" review that this Court must accord the state court's decision under § 2254(d):

---

[12] Although Pennsylvania courts typically articulate a three-prong test for gauging ineffective assistance claims and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts.

We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id., at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." Id., at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

Renico v. Lett, — U.S. — , 130 S.Ct. 1855, 1862 (2010). See also Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings…. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther."). The Court also is mindful that:

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [Knowles v. Mirzayance, 556 U.S. at —, 129 S.Ct. 1411, 1420 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at —, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard*.

Harrington, 131 S.Ct. at 788 (emphasis added).

**(ii)	Attorney Parroccini's decision to not use the statements made to the 911 dispatcher to impeach Jessica's and Lucille's trial testimony**

In Ground 4(b), Petitioner argues that Attorney Parroccini was ineffective for failing to impeach Jessica's and Lucille's trial testimony with statements they made on the 911 call. The transcript of that call was admitted as evidence during the October 15, 2010, PCRA hearing. The following is the relevant excerpt from it:

Dispatcher ("D"):     What's the problem?
Jessica Snyder ("JS"): We need police at 1108 Madison Avenue …
D:     What's going on?
JS:     Someone is trying to break in my door, me and my grandma are here by ourselves…
     Get the police
     - - -
D:     What's your name?
JS:     Jessica Snyder.
     - - -
     O.K., seriously, my biological father just got out of jail yesterday afternoon.
D:     What's his name?
JS:     John Snyder
D:     O.K., Do you think it might be him?
JS:     Yes
D:     Did you see him or are you thinking?
JS:     … Yes, me and my grandma saw him, I know it was him, I saw him get into that car, I know it was [sic] his car looks like.
D:     What kind of car is it?
JS:     I don't know what kind of car it is….
D:     O.K.
JS:     I know it's a little red car….
D:     O.K.
     - - -
     …. did you see which way he went? Did he go up Madison, which way did he go, which way did he take off?
JS:     He went toward Pennsylvania Avenue, up Hammond.
Background    No, no
JS:     Yes he did, I watched him… he ran towards the car, the car was parked on Hammond Street, going up toward Pennsylvania Avenue.
D:     O.K., Alright…. Whimpering in the background from the call
JS:     I know it was him
     - - -
D:     Why was your dad in jail?
JS:     Because he raped me
D:     Alright, O.K., Do you have a protection order?
JS:     Yeah, he was banging on the door grandma

23

D: O.K., so you have a PFA?
JS: Yes, I have a PFA…. (tearfully speaking)
  … [C]an you talk to [my grandmother?]
    - - -
Lucille Woods ("LW"):  Yes, I'm trying to get my daughter, the door was locked and everything, I heard banging and I ran to the front door, and and [sic] I'm sure that it was him, he was just he was short, not too short, I am shaking like a leaf.
D: O.K.
LW: Oh my god, it's two o'clock in the morning, I'm trying to get my daughter, she's got to get home, I don't know if he was banging on the door or banging on the car. All of the sudden we heard this terrible banging.
    - - -
  It was coming from the driveway, I heard the banging I saw him running from the driveway.
    - - -
LW: It has to be John Snyder, he just got out of jail last night.
D: Out of jail where? Here in Warren?
LW: He did, they just released him from jail last night.
D: O.K.
LW: I don't know of anyone else that would be doing this.
    - - -
D: O.K., do you know anybody who has that kind of car?
LW: I couldn't see the car, o.k.

(SCR at 195-99).

At the PCRA hearing, Petitioner stated that he and Attorney Parroccini discussed introducing the 911 transcript at the trial and Parroccini told him that he was not going to use it because Jessica had stated during the call that Petitioner had raped her. (SCR at 481). Parroccini's testimony corroborated Petitioner's on this point. He explained that he made a "strategic decision" (SCR at 495) not to use the 911 tape for impeachment purposes because:

> I felt there were two references that were rather negative to Mr. Snyder. One, the allegation his daughter made in the transcript that Mr. Snyder had raped her and the other allegation was the fact he just had gotten out of jail. I weighed the value of that with the testimony of Lucille and Jessica and, frankly, I didn't think it was worth the risk of the jury hearing that he had raped somebody or had been in jail even if those portions of the – and, frankly, I wasn't so sure that I could keep those portions out. My fear was that once I let the 9-1-1 tape in the whole thing [sic] come in and I felt that would be rather devastating to the case.

(SCR at 495. <u>See</u> <u>also</u> SCR at 496-97). When asked during his cross-examination why he thought there was a risk that if he used a part of the 911 transcript that more damaging parts of it might subsequently be introduced by the prosecution, Parroccini stated that his thinking was informed by "12 years of experience doing this." (SCR at 500). He explained that in weighing the risk that damaging portions of the 911 tape might get introduced against the impeachment value the tape presented, he decided not to utilize it, noting that "it was important for [the jurors] not to hear that Jessica believed that [Petitioner] raped her. It was equally not [sic] important for them to hear he had just gotten out of jail." (SCR at 502).

Attorney Sloane argued to the PCRA court that the entirety of the 911 tape would not have been admitted at trial if Parroccini had use portions of it as impeachment evidence, but the PCRA court determined that Parroccini had made a strategic decision not to use the tape because it introduced at least the risk that other, more damaging parts of it might be heard by the jury. (SCR at 218, "Petitioner failed to establish that trial counsel lacked a reasonable basis for his performance. To the contrary, the Court finds that trial counsel had a reasonable basis for not presenting the 911 transcript."). The PCRA court further held that Petitioner did not establish that he was prejudiced by Parroccini's tactical decision. (SCR at 218-19).

The PCRA court's determination withstands review under AEDPA's deferential standard. Parroccini's decision is the type of strategic choice that a court typically may not second guess, and this Court cannot conclude that no fairminded jurists could agree with the PCRA court's evaluation of this claim. <u>Harrington</u>, 131 S.Ct. at 786 (§ 2254(d) … preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents). <u>See</u>, <u>e.g.</u>, <u>Strickland</u>, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); <u>see</u> <u>also</u>

<u>Thomas v. Varner</u>, 428 F.3d 491, 500 (3d Cir. 2005) ("where it is shown that a particular decisions was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively unreasonable becomes 'virtually unchallengeable.'"). Petitioner has not established that the defense would have been able to keep the jury from hearing damaging statements made on the 911 tape. The trial court may have disallowed certain parts of it from being introduced, but Petitioner has not shown for certain that that would have been the case.

Additionally, the PCRA court's holding that Petitioner was not prejudiced by Parroccini's decision not to utilize the 911 tape also withstands review under AEDPA. Petitioner's contention that the tape establishes that Jessica and Lucille "perjured" themselves during the trial is not supportable. For example, he highlighted during the PCRA proceeding that Jessica testified at trial that he had screamed at her that he was going to kill her, but that she did not tell the 911 dispatcher that information. Although this is true, it does not mean that Jessica perjured herself at trial, it just means that her trial testimony covered grounds she did not discuss with the dispatcher. And although Petitioner insists that Jessica's statements to the 911 dispatcher demonstrate that she only assumed that he was the vandal, a fair reading of it reflects that she stated that she actually saw Petitioner. She also told the 911 dispatcher that she recognized his car, which is consistent with her trial testimony. As for Lucille, she did definitively identified Petitioner during her trial testimony, but indicated to the 911 dispatcher only that she thought that the vandal "had to be [Petitioner]" because he had just gotten out of jail and she did not "know of anyone else that would be doing this." (SCR at 199). The transcript reveals, however, that both Lucille and Jessica were afraid and upset when they were speaking to the dispatcher. Lucille may have been able to explain to the juror that once she calmed down and reflected upon the incident that she became more sure of her identification. In any event, considering all of the evidence admitted at the trial, this Court cannot conclude that the PCRA court's determination that Petitioner was not prejudiced was an

"unreasonable application of" <u>Strickland</u> or an unreasonable determination of the facts. 28 U.S.C. § 2254(d). [13] It cannot be said that all fairminded jurist would have concluded that there is a reasonable probability that Petitioner would have been acquitted had Parroccini utilized the statements the Jessica and Lucille made to the 911 dispatcher.

Based upon all of the foregoing, Ground 4(b) must be denied.

### (iii) Parroccini's failure to object and request a cautionary instruction when references to Petitioner's prior bad acts were made at trial

Petitioner points to two instances during his trial when a reference was made to his prior bad acts. One instance was when, without an objection by Parroccini, the prosecutor elicited testimony from Officer Reinken that Petitioner had a Protection from Abuse Order ("PFA") that prohibited him from going to Jennifer's home. (SCR at 312-13). The other instance was when Parroccini was questioning Jessica and asked her about the statements she made at the April 9, 2009, "revocation hearing[.]" (SCR at 335).

In rejecting this claim, the PCRA court held that Parroccini's reference to the "revocation" hearing (he never stated that it was related to his parole) was not evidence of Petitioner's prior bad acts. (SCR at 221-22). As for Officer Reinken's PFA comments, the PCRA agreed with Petitioner that Parroccini should have lodged an objection to the testimony; however, the court determined that Petitioner failed to demonstrate that he was prejudiced by the PFA reference (or the mention to the "revocation" hearing). (SCR at 221-22).

---

[13] The Third Circuit Court has noted that "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." <u>Buehl v. Vaughn</u>, 166 F.3d 163, 172 (3d Cir.1999) (citing <u>Strickland</u>, 466 U.S. at 695). This is so because "[a] court simply cannot" "determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different[,]" "without considering the strength of the evidence against the accused." <u>Id.</u>

When reviewing the state court's adjudication of this claim through AEDPA's deferential standard, this Court cannot grant Petitioner relief on this claim. As the PCRA court concluded, Parroccini should have objected when the PFA was discussed and perhaps should have requested a cautionary instruction. But Petitioner must establish more than just that Parroccini acted objectively unreasonably. He must show that the state court's adjudication of this claim was an "unreasonable application of" Strickland or an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Stated another way, he must show that no fairminded jurists could agree with the state court's decision that he was not prejudiced. Harrington, 131 S.Ct. at 786. He has not met that burden. Jessica was his daughter. They had lived together. She knew what kind of car he drove. She was certain that Petitioner was the man who smashed out the windows of her mother's van. Petitioner was Lucille's son-in-law and she also was sure that Petitioner was the culprit. Even Petitioner's own witnesses established that he was on the road after 1:15 a.m. the morning of the incident, was driving a red car, and was in the vicinity of Jennifer's home. Officer Reinken's testimony showed that Petitioner could have left his mother's home, dropped Natasha off at her home, stopped at Jennifer's house and smashed out her van windows, and made it back to his mother's home all within a short amount of time. Thus, while Petitioner contends that the prosecution's case against him was weak, there actually was strong direct and circumstantial evidence of his guilt. That makes it more difficult for him to establish prejudice under Strickland, and as a consequence makes it harder to prove that he is entitled to relief under AEDPA's standard of review.

Based upon all of the foregoing, Ground 4(c) must be denied.

### C.       Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  28 U.S.C. § 2253 provides that "[a]

certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Id.</u> Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be denied. Accordingly, a certificate of appealability should be denied.

**III.    CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the petition for a writ of habeas corpus be denied and that a certificate of appealability be denied.

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the petitioner must seek review by the district court by filing objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to do so will waive the right to appeal. <u>Brightwell v. Lehman</u>, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: September 24, 2013

cc:    The Honorable Nora Barry Fischer
       United States District Judge